# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

Tammy Livingston, individually, and as
Beneficiary and Co-Trustee of the Livingston
Music Interest Trust[1]

    Plaintiff,

v.

Jay Livingston Music, Inc.,
a Tennessee corporation,
and Travilyn Livingston, in her
individual capacity

    Defendants.

Case No. _____

## VERIFIED COMPLAINT FOR DECLARATORY RELIEF

Comes now the Plaintiff, Tammy Livingston, individually, and as beneficiary and named Co-Trustee of that certain California music interest subtrust (the "Livingston Music Interest Trust") by and through her undersigned counsel, and for her Verified Complaint ("Complaint") against Defendants, Jay Livingston Music, Inc., a Tennessee corporation ("JLM"), and Travilyn Livingston[2] ("Travilyn"), individually, (collectively "Defendants"), and hereby states as follows:

---

[1] That certain California music interest trust created under the 13th Amendment to the Survivor's Trust created under the Jay and Lynne Livingston Family Trust of 1985. This in an action to **enforce, honor and respect** the terms of the Jay and Lynne Livingston Family Trust of 1985 as more fully defined below, each subtrust created thereunder, and Jay Livingston's Estate Planning Documents as defined below.

[2] To avoid confusion and for ease of reference, the certain parties are referred to herein by their first names; no disrespect is intended.

## NATURE OF THE ACTION

Jay Livingston was a prolific songwriter. Jay (together with writing partner Ray Livingston) wrote a number of classic songs. Jay's catalog as songwriter includes "Silver Bells", "Mona Lisa", Whatever Will Be, Will Be", (Que Sera Sera") "and "Tammy" as well as the theme songs to classic hit TV shows like "Mr. Ed" and "Bonanza." In 2019, a multi-national corporation licensee paid a synch fee of $175,000 for a limited use of Whatever Will Be, Will be (Que Sera Sera), and another licensee paid a sync fee of $150,000 for the same song. Whatever Will Be, Will Be", ("Que Sera Sera") is sometimes hereinafter referred to as "Que Sera," and its relevance to this Petition for Declaratory Judgment will be discussed further below. Jay Livingston's song catalog includes over 800 songs (each a "song")

The Livingston Music Interest Trust ("Livingston Music Interest Trust") was created under that certain Survivor's Trust (the "Survivor's Trust") by that certain Twelfth Amendment and Restatement of The Survivor's Trust Created Under The Jay and Lynne E. Livingston Family Trust of 1985, dated December 13, 2000 (the "12th Amendment") and the Thirteenth Amendment to the Survivor's Trust Created Under The Jay And Lynne E. Livingston FamilyTrusts of 1985 dated January 5, 2001 (the "13th Amendment"), which Survivor's Trust was created under the Jay and Lynne E. Livingston Family Trust of 1985 dated August 28, 1985 (the "Family Trust"). The Livingston Music Interest Trust, the Survivor's Trust and the Family Trust, and each subtrust created under any of the foregoing are sometimes collectively referred to herein as the "Trusts."

The Trusts were specifically designed in more than 15 years of estate planning legal advice with competent estate planning counsel to hold the songwriter's royalties Jay Livingston, Plaintiff's grandfather, retained at his death, and to assure his daughter and granddaughter received their respective shares. Because this was of particular concern to Jay, Jay and his counsel

meticulously stated in the Trusts the shares of such songwriters royalties each Trust beneficiary was to get upon his death, clearly employing the terms of the Trusts as his testamentary intent identical to a will; *i.e.,* a will substitute, a common estate planning practice.

This Petition for Declaratory Judgment was necessitated by the one or more of the Defendants filing notices of termination under the Copyright Act of 1976, 17 U.S.C. §§ 101, et seq., with respect to the United States copyrights for approximately 55 of the songs written by Jay Livingston, including, but not limited to the song classic, "Whatever Will Be, Will be (Que Sera Sera),." Such copyright terminations were stated to be effective on July 15, 2019 and other applicable subsequent dates prior to the date of filing of this Petition

One or more of these copyrights generate material songwriter royalties in which Plaintiff presently shares as a beneficiary of the Trusts, and directly as an individual. However, Plaintiff's shares of such songwriter royalties may be diminished, eliminated or otherwise adversely impacted by the effect of the filing of the notices of termination ("Notices of Termination") and any resulting effective termination of the applicable copyrights for the applicable songs ("Copyright Terminations"). Songs for which notice of termination have been filed or for which the stated effective termination date has passed are referred to as Terminated Songs.[3]

Defendants have refused for years to provide adequate information to verify and determine whether Plaintiff's appropriate share or amount of songwriter royalties pertaining to any of the songs has been paid to Plaintiff in accordance with the applicable contracts and the terms of the Trusts. In particular, Defendants have refused to provide such information with respect to the Terminated Songs since the applicable specified effective date in the applicable notices of termination.

---

[3] Plaintiff's use of such terminology is for convenience and does not constitute an admission that any Notice of Termination or Termination is effective as a matter of law.

Hence, Plaintiff seeks a declaratory judgment that the notices of termination and potential termination are ineffective as a matter of law, or if effective, that such terminations do not diminish, eliminate, or, adversely impact Plaintiff's rights to receive, collect and be paid a share of songwriter royalties under the terms of the applicable contracts and the terms of the Trusts, as she has previously prior to the effectiveness of any song copyright termination of any Terminated Song or otherwise.

## PARTIES

1. Plaintiff, individually, and as beneficiary and Co-Trustee of the Livingston Music Interest Trust, is a citizen and resident of the State of New York, and the granddaughter of Jay Livingston and the biological daughter of Travilyn. Plaintiff is sometimes referred to herein as "Tammy" or "Plaintiff."

2. JLM is a corporation organized under the laws of the State of Tennessee. JLM's principal place of business is in Nashville, Tennessee, and it may be served with process through its registered agent, Randy Talmadge at 206 Leonard Ave, Nashville, TN 37205. Based on information and belief, the CEO of JLM is Randy Talmadge, Travilyn's husband ("Randy"), and Travilyn and Randy own all of JLM. Upon information and belief, JLM is a music publisher that today, licenses and administers more than 800 copyrights to musical compositions written in whole or in part by Jay Livingston during his lifetime.

3. Travilyn is a resident of Davidson County, Tennessee, and is Co-Trustee of the Livingston Music Interest Trust and the biological[4] mother of Plaintiff. She may be served with process at 206 Leonard Ave, Nashville, TN 37205.

---

[4] Plaintiff was raised by her grandfather, Jay Livingston and grandmother in Los Angeles, CA and lived with them most of the time until she was in her mid-twenties.

## JURISDICTION AND VENUE

4. This is an action for declaratory relief brought under 28 U.S.C. §§ 2201, et seq., and under the Copyright Act of 1976, 17 U.S.C. §§ 101, et seq. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5. This Court also has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332, because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

6. This Court has specific personal jurisdiction over Defendants based upon their own respective certain acts or omissions conducted in, and minimum contacts, with the State of Tennessee, as more fully described herein.

7. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's desire to enforce, the terms of the Trusts and to obtain a declaratory judgment as prayed for herein, including without limitation, the respective conduct by Defendants described herein, occurred in this district, and the residence of all named Defendants.

## FACTUAL ALLEGATIONS

**The Trusts.**

8. Jay Livingston ("Jay"), a prolific songwriter, was Plaintiff's grandfather, and Travilyn's father, who died October 17, 2001, and was a grantor of the Family Trust with his first wife, Lynne, and the rest of the Trusts, as more fully described herein.

This is an action to enforce, honor, and respect the terms of the Trusts and the testamentary intent of Jay and his Estate Planning Documents as such term is defined below, and is not in any way, an action to challenge any provision of the Trusts and/or any estate planning document of Jay

Livingston, as defined in the Survivor's Trust.[5] Specifically, this is **not** an action (i) to contest the validity of any of Jay's Estate Planning Documents, (ii) seeking to obtain an adjudication that any part of Jay's Estate Planning Documents is void or seeking otherwise to void, nullify or set aside any part of Jay's Estate Planning Documents; (iv) filing a claim against Jay's estate or any trust created under an Estate Planning Document following the rejection of a claim (or deemed rejection under applicable California Probate Code sections) by the Executor of Jay's will or the Trustee of any such trust; (v) challenging the characterization of any assets as Jay's separate property or the community property of Jay or Jay's Spouse pursuant to an agreement between Jay's Spouse and Jay, or by the Executor or Trustee under any of Jay's Estate Planning Documents (vi) challenging a transfer of property on the grounds it was not the transferor's property at the time of the transfer or (vi) filing a creditors claim or prosecution of an action based on it (collectively, a "Contest").

9. The factual details of Jay Livingston's complicated estate plan and complicated asset mix described below are taken from Probate Documents filed for a hearing held on November 7, 2003, and were filed on September 2, 2003, in the matter of Jay and Lynne Livingston Family Trust of 1985 Case No. SP005438, filed in the Superior Court of California, County of Los Angeles (the "November 7 Filing").

10. Upon information and belief, on August 28, 1985, Jay Livingston assigned all of his assets, whether real or personal, to the Jay and Lynne E. Livingston Family Trust of 1985.

---

[5] Article III of the Thirteenth Amendment amending paragraph 13 of Article Eleven of the Survivor's Trust states: "The term 'Estate Planning Documents' refers to my Will, any Codicil to it, any trust (revocable or irrevocable) established by me (alone or with another), during my lifetime or upon my death, including this Trust, an amendment to any such revocable trust, *any other document executed by me (alone or with another) which affects the disposition of assets of my estate or any such trust following my death* (including, but not limited to, an agreement with my Spouse concerning our respective property rights and an agreement among co-owners of a business or other asset concerning the sale or other disposition of a deceased or disabled co-owner's interest) any beneficiary designation executed by me and any document executed by me which exercises a power of appointment vested in me."

11. Plaintiff and Travilyn individually, and as beneficiaries and Co-Trustees of the Livingston Music Interest Trust, are each entitled to certain shares of songwriter royalties left to them by famed songwriter Jay Livingston, who sadly passed away on October 17, 2001, in Los Angeles, California, as grandfather to Plaintiff and father to Travilyn.

12. The Trusts through their various versions and modifications commencing with The Jay and Lynne E. Livingston Family Trust of 1985, the Twelfth Amendment and the Thirteenth amendment to the Survivors Trust, and the Livingston Music Interest Trust, created under the Thirteenth Amendment, all clearly evidence Jay's longstanding and consistent desire for Plaintiff to benefit from the shares of songwriter's royalties left to her by Jay.

13. The Trusts were specifically designed in years of estate planning with competent estate planning counsel to hold the songwriter's royalties Jay retained at his death, and which, based on the November 7 Filing, were of particular concern to Jay.

14. Jay and his counsel meticulously stated in the Trusts the shares of such songwriters royalties each Trust beneficiary was to get upon his death, clearly employing the terms of the Trusts as his testamentary intent identical to a will.

15. Upon information and belief, the two largest publishers at issue with Jay Livingston's songwriting catalog are Sony Music Publishing and JLM. However, Plaintiff, Travilyn, and the Music Interest Trust also receive periodic songwriter royalties from other music publishers such as Warner Chappell, Disney, and EMI (later acquired by Sony).

16. As a result of Jay's desire and intent expressed in the terms of the Trusts, Plaintiff presently actually directly receives songwriters royalties, though it is not possible to determine whether the amounts so received are accurate due to the refusal of Defendants and Randy, in his capacity as President of JLM to provide sufficient verification information. No adequate verification

information has been provided with respect to the Terminated Songs, despite repeated lawful requests for the same.

17. Jay Livingston and his first wife, Lynne E. Livingston (herein, "Lynne"), entered into the Family Trust, which provides for the Survivor's Trust and various other Trusts with respect to all of their assets, including their "music interests," including all of their copyrights to musical compositions composed by each of them, pursuant to Section 3.2(f) of the Family Trust. Lynne passed away in 1991.

18. Based on information and belief, the two major assets directly owned by Jay at his death were his elaborate residence estate, and his share of songwriter royalties, which he left in the Trusts, in part for Tammy's benefit.

19. At Lynne's death, Lynne's portion of the Family Trust became irrevocable. Jay's portion of the Family Trust, the Survivor's Trust, remained revocable by Jay.[6]

20. Lynne's portion of the Family Trust was divided into two components: the Residual Trust and Lynne's Music Interests Trust. The Residual Trust and eighty percent of Lynne's Music Interests Trust was held for Jay's benefit during his lifetime. Twenty percent of Lynne's Music Interests Trust was further divided into two trusts, one for the benefit of Lynne's and Jay's daughter, Travilyn, and one for the benefit of Travilyn's daughter, Tammy, who was formerly known as LAURA FRANCIS and Tammy Lynne Andries. These are referred to as "Travilyn's Music Interests Trust" and "Tammy's Music Interests Trust," respectively.

21. After Lynne's death, Jay amended his portion of the Family Trust to establish a trust for his second wife, Shirley, and to establish trusts for the benefit of various family members. He also set

---

[6] Two charts of the sub-trusts of the Family Trust, and the respective sub-trusts of the sub-trusts, applicable at Jay's death and applicable after Shirley's death (Jay's second wife), are attached as **Exhibits A and B**, respectively. A copy of the Family Trust as well as the 12th and 13th Amendments thereto is attached as **Collective Exhibit C**.

up specific trusts for this community property interests in his songwriter royalties. Aside from Jay's second wife, Shirley, who passed away in 2013, the two beneficiaries with the most significant interests in the Family Trust are Jay's daughter Travilyn and Jay's granddaughter, Travilyn's daughter, Tammy ("Plaintiff" or "Tammy")[7].

22. Jay thereafter married Shirley Livingston ("Shirley").

23. Jay amended the Survivors Trust to create a marital deduction trust for Shirley, following his death (the "Marital Deduction Trust").

24. Jay was the Trustee of the Family Trust and all of its sub-trusts until he appointed Gary Kress as Co-Trustee of the Survivor's Trust, who consented to serve as Co-Trustee on February 15, 2000. Jay and Gary Kress served as Co-Trustees of the Survivor's Trust and Jay served as sole Trustee of all of the other sub-trusts until Jay's death on October 17, 2001.

25. During Jay's lifetime, each of Jay, Travilyn, and Tammy was the sole beneficiary of his or her respective trust. Each was entitled to receive all of the net income of his or her respective trust.

26. At Jay's death, Jay's sister, Vera Drazen ("Vera") became the beneficiary of five percent of Lynne's QTIP Trust ("Vera's Trust"). The balance (95% of Lynne's QTIP Trust or 38% of all of the music interests) poured, in equal shares, into Travilyn's Music Interests Trust and Tammy's Music Interests Trust.

27. As such, after Jay's death, each of Travilyn's Music Interests Trust and Tammy's Music Interests Trust contained 23.75% of all of the music interests or a combined total of 47.5% of the music interests.

---

[7] Plaintiff is also referred to in the Family Trust documents as "Laura Francis" and in subsequent proceedings as "Tammy Wacholtz" and/or "Tammy Talmadge".

28. Various assets, including Jay's community property half of the right to receive songwriter royalties were allocable to Shirley's QTIP Trust.

29. At Shirley's death, Shirley's QTIP Trust was distributable as follows: The music interests were retained in trust ("Jay's Music Interests Trust") and the balance of the trust was distributable in equal shares to Travilyn and Tammy.

30. When Jay's Music Interests Trust was created after Shirley's death, it was divided into three trust shares, ten percent for Jay's brother, Alan, ("Alan's Trust") and forty-five percent for each of Travilyn and Tammy into a single trust, created pursuant to the terms of the 13th Amendment amending Paragraph 6(h)(ii) of Article 5 of the Survivor's Trust creating solely for purposes of this pleading the Livingston Music Interest Trust. The Livingston Music Trust holds 22.5% of the music interests for each of Travilyn and Tammy, and each of them is a Co-Trustee.

31. Alan's Trust was to pay him all of the income for life. At Alan's death, his trust will be held for his son, Christopher Livingston ("Christopher"), who will receive all of the income for life. At Christopher's death, Travilyn's husband, Randy Talmadge ("Randy"), will receive the income interest. At Randy's death, his interest is added to Travilyn's and Tammy's Trusts under Jay's Music Interests Trust.

32. Travilyn's Music Trust and Tammy's Music Trusts will pay all of their income to their respective beneficiaries. At the death of each of Travilyn or Tammy, her income interest will pass to her descendants by right of representation, or, if none, shall augment each other's share. Tammy's three descendants are Austin, Hannah, and Michelle. At such time as there are no descendants, Jay's Music Interests Trust provides that it will terminate, and its assets will pass to Jay's heirs at law. Per the terms of the 13th Amendment, Paragraph 6(h)(ii) of Article 5 of the Survivor's Trust, both Plaintiff and Travilyn, are beneficiaries and Co-Trustees of the Livingston Music Interest Trust which receives

songwriter royalties from various music publishers who commercially exploit Jay Livingston's works of authorship. In addition, Travilyn's Music Trust and Tammy's Music Trust each have 23.75% of the music interests.

33. As will be discussed below, all of Jay's elaborate estate planning, including Plaintiff's right to benefit from her grandfather's songwriter royalties as he intended, could be terminated based on the actions of Defendant Travilyn in filing notices of copyright termination as described herein. Defendants and Randy have refused to provide the information required to determine whether Plaintiff continues to receive the songwriter royalties to which she is entitled under the Trusts and/or the contracts which govern those rights, and Plaintiff seeks this Court's clarification of her rights to receive, collect and/or be paid her appropriate share of songwriter royalties left to her by her grandfather under the terms of the Trust.

**The Popular Songwriters Renewal Contracts.**

34. Upon information and belief, Jay Livingston during his lifetime self-published many of the songs in JLM's catalog under the dba "Jay Livingston Music."

35. Upon information and belief, on August 28, 1985, Jay Livingston assigned all of his assets, whether real or personal, to the Jay and Lynne E. Livingston Family Trust of 1985.

36. Songwriter royalties are typically paid by a music publisher who will acquire the control or ownership of a song through a license or transfer of a copyright from the songwriter, often referred to as a "songwriter contract". In exchange, the publisher promotes the song, grants licenses for its commercial use, and administers the copyright, which usually entails tracking and collecting royalties from various licensees, monitoring and preventing infringement, and in turn paying the songwriter his share of the royalties.

37. Upon information and belief, Jay Livingston, beginning in 1984 and continuing until for numerous years, executed a series of form, single song, music publishing agreements, entitled "Popular Songwriters Renewal Contract", which, based on information and belief, were form contracts provided by the Songwriters Guild of America (the "AGAC Agreements") between himself, in his own name as the songwriter, and "Jay Livingston Music," apparently a music publishing company owned at its creation by Jay.

38. Pursuant to the AGAC Agreements, Jay Livingston granted and transferred (i) the copyrights, subject to cancellation in certain events under the applicable agreement and (ii) the right to collect 100% of the gross receipts from exploitation of the applicable songs to JLM, in exchange for retaining the right to receive fifty percent (50%) of the royalties from the collections of gross receipts of certain types of income (and lesser shares of other types of less significance income, in today's market place). The 50% retained by Jay Livingston is sometimes referred to herein as the "Writer's Share", and the portion granted to JLM is sometimes referred to herein as the "Publisher's Share."

39. Based on information and belief, the AGAC agreements are contracts governed by state law, and the Writers Share to be paid to Jay, his heirs, successors and assigns thereunder, are likewise governed by state law.

40. Upon information and belief, at the time they were made, the grants by Jay Livingston to Jay Livingston Music pursuant to the AGAC Agreements were grants to himself as the founder of Jay Livingston Music (a sole proprietorship Jay merely did business as), and not grants to third parties, capable of termination pursuant to the notices of termination, which are the subject of this Petition for Declaratory Judgment under the Copyright Act of 1976.

12

Case 3:22-cv-00532   Document 1   Filed 07/14/22   Page 12 of 20 PageID #: 12

41. Upon information and belief, Jay Livingston Music (and later, based on information and belief, its successor JLM[8]) and Jay Livingston (and his named beneficiaries under the Trusts after his death) have been operating under the AGAC Agreements since the 1980s.

42. According to the sworn testimony of JLM president, Randy Talmadge, Jay Livingston executed a separate AGAC Agreement for every song "Jay Livingston Music" publishes. *See* **Exhibit D**.[9]

43. An AGAC Agreement was executed with regard to the song classic Que Sera Sera. As part of Defendants consistent refusal to provide information, Plaintiffs have only been provided a handful of AGAC Agreements, including one for Que Sera Sera. As Plaintiff has not seen an AGAC Agreement for each song, she cannot be sure, and does not hereby admit for any purpose, that an AGAC Agreement exists for each song written by Jay Livingston that JLM publishes.

44. Upon information and belief, on May 11, 2000, Jay Livingston, in his individual capacity, executed a separate agreement between himself and JLM extending the term of the "Popular Songwriter Agreements" not "Popular Songwriter Renewal Contracts" relative to 248 separate songs, from 28 years to the life of the copyright. *See* **Exhibit E**, attached hereto.

45. The foregoing extension of the term of the AGAC agreements constitutes a renegotiation of the grant in the original AGAC Agreements, which results in additional grants, none of which are grants capable of termination pursuant to the notices of termination which are the subject of this Petition for Declaratory Judgment under the Copyright Act of 1976. The Trusts governed the

---

[8] Upon information and belief, JLM is the successor legal successor to Jay Livingston Music, by assignment executed by Travilyn.

[9] Plaintiff has requested copies of all of the AGAC Agreements, but Defendants have refused to provide all but a handful, including, among others, those pertaining to the songs "Que *Sera Sera*" and "Tammy," notwithstanding the sworn testimony of Randy Talmadge.

rights to songwriters royalties Jay held at his death, which were payable in part to Plaintiff and her mother, Travilyn as beneficiaries pursuant to the terms of the Trusts.

**The Notices of Termination.**

46. Upon information and belief, Travilyn and her husband Randy Talmadge own JLM and run the day-to-day operation of JLM from their home in Nashville, TN.

47. Upon information and belief, on May 28, 2015, Travilyn Livingston, in her statutory capacity as Jay Livingston's daughter, in defiance of the terms of the Trusts and her father's estate planning documents, served a "notice of termination" under § 203 of Title 17 U.S.C. of the Copyright Act ("a Notice of Termination") with respect to the song Que Sera Sera on JLM. The Notice of Termination purported to terminate "All right, title and interest in copyright or of any right under copyright in the Composition granted or transferred in the *Popular Songwriter's Contract* between Jay Livingston Music dated July 15, 1984 and the amendment thereto dated May 18, 2000." (Emphasis added). *See*, **Exhibit F**, attached hereto, and hereinafter referred to as "Defective Termination."

48. In fact, the applicable Notice of Termination is defective because the words "Popular Songwriter's Contract" appear nowhere on the actual agreement referred to in the Notice of Termination, and a Popular Songwriter's Agreement is, in fact, a different form provided by the Songwriters Guild of America which has different terms. The actual name of the agreement Travilyn sought to terminate via her Notice of Termination is "Popular Songwriters Renewal Contract." which, again, has different terms than a "Popular Songwriters Contract."

49. The above-mentioned Notice of Termination was addressed to the attention of Randy Talmadge at the home they shared, which upon information and belief was also the mailing address for JLM. *Id*.

50. Upon information and belief, that same day on May 28, 2015, Travilyn served a separate Notice of termination under § 203 of Title 17 U.S.C. of the Copyright Act ("hereinafter sometimes referred to as "Section 203") on JLM purporting to terminate "All right, title and interest in copyright or of any right under copyright in the Composition granted or transferred in the Copyright Assignment between Jay Livingston and Jay Livingston Music dated July 15, 1984." *Id*.

51. The effective date of both Notices of Termination was July 15, 2019, and such notices may be effective, subject to challenges to the effectiveness of such Terminations filed before the running of the statute of limitation and this Court's authority.

52. Plaintiff, as a trustee and a beneficiary of the Livingston Music Interest Trust, did not receive a Notice of Termination with regard to Que Sera Sera or any of the other songs for which Travilyn filed Notices of Termination.

53. Upon information and belief, between May 2015 and August 2020 Travilyn, served separate but substantially similar Notices of Termination under Section 203 and the regulations thereunder, purporting to terminate copyright grants between Jay Livingston and JLM and Jay Livingston Music for fifty-five (55) songs. Of those 55 songs, twenty-nine (29) Terminations have allegedly become effective as of this filing. A list of the copyright Terminations at issue, as well as their respective effective dates, is attached hereto as **Exhibit G**.

54. Upon information and belief, Travilyn subsequently certain copyright interests back to JLM.

55. None of JLM, Travilyn, or Randy has provided Plaintiff information regarding the royalty amounts earned with respect to the songs covered by the Terminations filed by Travilyn, or the payments of the songwriter's royalties specifically pertaining to the songs covered by the Terminations filed by Travilyn, which adds to Plaintiff's concern that the payment of such royalties

to her and her receipt of such royalties is in jeopardy, and contrary to the longstanding desires of her grandfather.

56. Section 203 of the Copyright Act of 1976 provides, subject to various conditions and limitations, that a deceased author's widow or widower and surviving children may terminate the deceased author's grant of a transfer or license of a renewal copyright or any right under it, executed on or after January 1, 1978.

57. Termination of a grant under this subsection affects only those rights covered by the grant that arise under the Copyright Act, and in no way affects rights arising under any other Federal, State, or foreign laws."

58. Section 106 of the Copyright Act indicates the termination of the applicable grant merely returns to the statutory heir (i) the right to reproduce the copyrighted work in copies or phonorecords, (ii) the right to prepare derivative works based upon the copyrighted work, (iii) the right to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending, (iv) the right to perform the copyrighted work publicly, (v) the right to display the copyrighted work publicly; and (vi) the right to perform the copyrighted work publicly by means of a digital audio transmission.

59. Further, because Plaintiff's rights to receive, collect and be paid songwriter royalties under the AGAC Agreements arise under state law, if the Terminations were deemed effective by this Honorable Court, such rights would not be negatively impacted by the Terminations.

60. Plaintiff reserves the right to amend this Verified Complaint as additional facts are uncovered in the discovery process.

# CAUSES OF ACTION

## COUNT I – ACTION FOR DECLARATORY RELIEF
(As to the Validity of All Notices Enumerated in Exhibit G)

61. Plaintiff incorporates and restates each of the above paragraphs as if fully stated herein.

62. An actual controversy has arisen, and now exists, between Plaintiff and Defendants concerning the validity and effectiveness of the purported Terminations under the 1976 Copyright Act, and the effect of such Terminations on Plaintiff's right to share in, receive and collect her share of songwriter royalties pursuant to the terms of the Trusts.

63. The actions of Defendants have caused and continue to cause, great and irreparable harm to Plaintiff for which there is no remedy at law, and will harm Plaintiff in the future.

64. Travilyn served the Notices of Termination described above. Upon information and belief, Travilyn submitted the notices for recordation with the U.S. Copyright Office.

65. The copyright Termination notices as filed enumerated in **Exhibit G**, including but not limited to the Defective Termination, are invalid as a matter of law.

66. Plaintiff individually and as a beneficiary and Co-Trustee of the Livingston music interest receives songwriter royalties from the musical compositions at issue, and such Notices of Termination and/or Terminations, if effective, would negatively impact Plaintiff's right to share in, receive and collect her share of songwriter royalties.

67. If Plaintiff is unable to receive a declaratory judgment, she will be without remedy with regard to the copyright terminations at issue, in the future.

68. Accordingly, Plaintiff seeks, pursuant to 28 U.S.C. § 2201, a judgment from this Court that the notices are invalid.

69. For the foregoing reasons, Plaintiff seeks the following declaratory judgment from the Court:

a. That the copyright terminations served by Defendants and enumerated in **Exhibit G** are not terminable because they were not in fact transfers or grants capable of termination under 17 U.S.C. § 203 as the songwriter renewal contracts were between Jay Livingston and himself (at the time the grants were made);

b. That, in alternative to (a) above, the copyright terminations served by Defendants enumerated in **Exhibit G** are invalid because they are an attempt to terminate the May 11, 2000 Agreement, itself a new grant, and termination of the same is not timely under 17 U.S.C. § 203;

c. That, in alternative to (a) and (b) above, the copyright terminations served by Defendants enumerated in **Exhibit G**, are invalid because they incorrectly describe the transfer or grant Defendants purport to terminate as a "Popular Songwriter Contract" instead of a "Popular Songwriter Renewal Contract."

d. In the alternative, if the court finds any or all of the Terminations valid and effective, Plaintiff hereby seeks a declaration by the Court that the effect of such Termination does not terminate Plaintiff's right to share in, collect and receive songwriter's royalties as a beneficiary of the Livingston Music Trust, any other Trust, or receive such directly, as she presently does, and that the effect of such Terminations has no impact of any type or kind on Plaintiff's right to share in, collect and receive songwriter's royalties emanating from the exploitation of the song catalog of Jay Livingston or the other nonmonetary rights and benefits under the AGAC Agreements. Further, if the terminations are effective, such termination effects only the rights that arise under the Copyright Act, including only, the right to reproduce,

prepare derivative works, distribute copies, and perform and display the compositions publicly and do not limit Plaintiff's right to receive royalties.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court grant her relief against Defendants as follows:

1. For a declaration that the termination notices enumerated in **Exhibit G** are invalid;

2. For Plaintiff's attorneys' fees and costs incurred; and

3. For such other and further relief as the Court deems just and equitable.

This 14th day of July 2022.

Respectfully Submitted By:

/s/ Jonathan M. Wolf
Jonathan M. Wolf #35445

Jonathan M. Wolf, PLLC
1515 Demonbreun St., Suite 1408
Nashville, TN 37203
jonathan@wolf.lawyer
615-422-5545

*Counsel for Plaintiff Tammy Livingston*

## VERIFICATION

I, Tammy Livingston, am the Plaintiff in the action herein and do hereby swear under penalty of perjury that the foregoing Verified Complaint, and the facts contained herein, to be true and correct to the best of my knowledge and belief.

*Tammy Livingston (Jul 14, 2022 14:05 EDT)*

Plaintiff Tammy Livingston