IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| Tammy Livingston, individually, and as Beneficiary and Co-Trustee of the Livingston Music Interest Trust[1] and as Beneficiary of the Tammy Livingston Music Interest Trust[2]<br><br>Plaintiff,<br><br>v.<br><br>Jay Livingston Music, Inc., a Tennessee Corporation, and Travilyn Livingston, in her individual capacity<br><br>Defendants. | Case No. 3:22-cv-0532<br><br>**Judge Waverly D. Crenshaw, Jr.**<br>**Magistrate Judge Alistair E. Newbern** |

**PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF No. 49-50)**

COMES NOW the Plaintiff, Tammy Livingston, individually, and as beneficiary and named Co-Trustee of that certain California music interest subtrust (the "Livingston Music Interest Trust") and as beneficiary of the Tammy Livingston Music Interest Trust, by and through her undersigned counsel, and pursuant to Federal Rule of Civil Procedure 12, submits the following Response Memorandum in Opposition to Defendants' Motion to Dismiss (ECF No. 49-50)

---

[1] That certain California music interest trust created under the 13th Amendment to the Survivor's Trust created under the Jay and Lynne Livingston Family Trust of 1985. This in an action to **enforce** the terms of the Jay and Lynne Livingston Family Trust of 1985.

[2] That certain 10% trust share granted to Plaintiff Tammy Livingston from the "Share for Issue" created pursuant to the Music Interests Trust formed pursuant to Section 3.2(f) and Section 3.7 of the Jay and Lynne E. Livingston Family Trust of 1985, as more fully described herein, and sometimes referred to herein as the "Tammy's Music Interests Trust."

("Mot", the "Instant Motion", "Defendants' Motion", and/or "Defendants' Motion to Dismiss") and hereby states as follows:

I. **INTRODUCTION.**

Defendants' Motion to Dismiss is neither grounded in law or fact and should therefore be denied. As outlined in her Second Amended Verified Complaint (ECF No. 46), Plaintiff was forced to file the instant action for a declaratory judgment to resolve a dispute over a series of deficient and legally invalid copyright terminations under 17 U.S.C. § 203, filed by Defendant Travilyn Livingston, in an egregious and brazen attempt to circumvent the estate planning and testamentary intent of her father (Plaintiff's grandfather), famed songwriter, Jay Livingston and her mother, Lynne E. Livingston (Plaintiff's grandmother).

Congress enacted this section in order to protect inexperienced authors who may have been too eager to give up their rights by giving them a "second bite at the apple" later in their careers. This is explicitly set out in the legislative history of Section 203 (House Report on Copyright Act of 1976, H.R. Rep. No. 94–1476, at 124 (1976)).[3] Congress sought to address concerns that creators may have unknowingly or unfairly transferred their rights at an early stage in their careers, often for inadequate compensation (H.R. Rep. No. 94-1476, at 124). The termination rights granted by 17 U.S.C. § 203 enable authors, or their heirs, to reclaim these rights and potentially renegotiate better terms for the remaining copyright term (M. Nimmer & D. Nimmer, Nimmer on Copyright § 11.01 (2021)).

---

[3] https://www.sfwa.org/2013/08/31/second-bite-apple-termination-rights-writers introduction/#:~:text=Congress%20enacted%20this%20section%20in,Copyright%20Act%20of%201976%2C%20H .R. (quoting House Report on Copyright Act of 1976, H.R. Rep. No. 94–1476, at 124 (1976)): "The provisions of section 203 safeguard[] authors against unremunerative transfers. A provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited. Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved.")

The instant case is not about a songwriter's heirs recovering long lost music rights from a giant record label or publishing company that were contracted away as part of an arm's length transaction. What makes the case at bar somewhat unique is that Defendant Travilyn Livingston has ostensibly served copyright terminations on her herself. Additionally, the contracts Travilyn seeks to terminate were not signed at the early stages of Jay Livingstons career, but rather late in his life. Defendant Travilyn Livingston as the statutory heir is attempting to terminate copyright assignments and publishing contracts between her father, Jay Livingston, and Jay Livingston Music, Inc., a publishing company that Travilyn owns with her husband and completely controls[4]. To that end, Defendant Travilyn Livingston is also a Beneficiary and Co-Trustee of the Livingston Music Interest Trust (Plaintiff being the other Beneficiary and Co-Trustee), the entity to which Jay Livingston Music, Inc. is required to pay songwriter royalties under the publishing agreements Travilyn Livingston is attempting to terminate. As such, she is on all sides of the transactions at issue, as the statutory heir, the music publisher, and Beneficiary and Co-Trustee of the Trust set up by Jay Livingston to receive the songwriter royalties for the benefit of Plaintiff and Travilyn Livingston. In essence, Travilyn Livingston, a Co-Trustee, is attempting to terminate copyright grants her father, intended to benefit Plaintiff and Travilyn Livingston by the express terms of the trust he established for their benefit, respectively. Despite her fiduciary duties to Plaintiff as Co-Trustee, Travilyn Livingston has refused to provide Plaintiff with any information regarding her actions with regard to the copyright terminations at issue and is withholding virtually all financial information regarding the flow of songwriter royalties from Jay Livingston Music into the trusts.

---

[4] There is a dispute and material question of fact as to when Travilyn Livingston came to own Jay Livingston Music.

Travilyn's termination maneuver is unequivocally an attempt to circumvent the testamentary intent of Jay Livingston as well as a breach of her fiduciary duties to Plaintiff. However, as outlined in Plaintiff's Second Amended Verified Complaint (ECF No. 46), the notices of termination at issue themselves are substantively and procedurally defective necessitating Plaintiff to seek declaratory relief from the Court.

In response to Plaintiff's complaint for declaratory relief, Defendants filed the instant Motion to Dismiss, which is premised on three main arguments, each of which is uniquely erroneous, unsubstantiated, and independently unavailing. First, Defendants erroneously argue that the copyright terminations are valid and that Plaintiff has failed to state a claim for which relief can be granted. At best, Defendants raise an issue of genuine material fact that is not appropriate for determination at the motion to dismiss stage. Second, Defendants erroneously argue that Plaintiff is not entitled to payment of royalties if the copyright terminations are valid. Defendants seem to imply that their willingness to acknowledge the express right to *receive* royalties under the trust is dispositive. This cute argument ignores the purpose of Travilyn Livingston's filing of the copyright terminations is an effort to terminate the legal obligation to *pay* royalties to the trust and has nothing to do with Plaintiff's right to *receive* these royalties under the terms of the Trust. Third, Defendants argue that Plaintiff is not entitled to a constructive trust because it is a remedy and not a cause of action. However, Defendants misinterpret that Plaintiff seeks a constructive trust pursuant to the declaratory relief that Plaintiff seeks and not as an independent cause of action. Defendants also generally fail to acknowledge that Plaintiff is entitled to the requested declaratory relief. Accordingly, for the reasons set forth in more detail below, each of Defendants' arguments fail, and the instant motion should be denied.

II. **LEGAL STANDARD.**

4

In resolving a motion brought under Federal Rule of Civil Procedure 12(b)(6), the Court treats all well-pled allegations in the complaint as true and draws all reasonable inferences from those allegations in favor of the non-moving party. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006). A claim is sufficient when the factual allegations are "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 548, (2007)).

The complaint must present "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A complaint need not contain "detailed factual allegations" to survive a Rule 12(b)(6) motion, but it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

A "motion to dismiss for failure to state a claim is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Lambert*, 517 F.3d at 439 (quoting *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005)) (emphasis added). The factual allegations in a complaint must be sufficiently detailed that they are beyond mere speculation of a legally cognizable cause of action. *Lambert*, 517 F.3d at 439. The plaintiff's complaint "should give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *German Free State of Bavaria v. Toyobo Co.*, 480 F. Supp. 2d 958, 963 (W.D. Mich. 2007) (citing *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994)).

## III. ARGUMENT.

**A. The notices of copyright termination are invalid, and Plaintiff has stated valid claims for declaratory relief. However, at the minimum, Defendant's Motion to Dismiss merely raises significant, genuine issues of material that are not appropriate for determination at the motion to dismiss stage.**

### i. The grants terminated 28 years after their execution.

Defendants' Motion to Dismiss erroneously argues "the grants did not terminate 28 years after their execution because the 2000 Agreement extended those grants to cover the entire term of copyright." Contrary to Defendants assertion, the May 18, 2000 Agreement which was explicitly executed in Jay Livingston's *individual capacity* and *not as Trustee*, was only capable of conferring rights that he then held in his *individual capacity*. Defendants simply ignore the fact that Jay and Lynne Livingston assigned all of their assets to the Family Trust in 1985. To that end, Defendants ignore the fact that Lynne Livingston's portion of the family Trust became irrevocable upon her death in 1991. *See Dudek v. Dudek*, 246 Cal. Rptr. 3d 27, 38 (Ct. App. 2019) (Noting "[o]nce such a trust is created and a valid transfer of property is made to the trust, the settlor no longer has any right to possess or otherwise dispose of the property placed in an irrevocable trust, such that that individual has no ability to reverse course or change his or her mind later.") Accordingly, the grants via publishing agreements Defendants sought to terminate in the Notices of Termination with respect to the Terminated Songs, actually terminated in accordance with their terms approximately 28 years after their execution (the rights reverting to the Trusts), prior to the time a copyright grant or license could be terminated in accordance with Section 203 of the Copyright Act of 1976 (17 U.S.C. §203).

Moreover, at least one song, for which Defendants filed a copyright termination which is at issue, entitled "What a Deal", Copyright Document # V9955D573, was not listed in the May

18, 2000 Agreement, and therefore could not be extended by it.[5] To that end, the signature page for the AGAC Agreement for "What a Deal" produced by Defendants in related litigation pending before this Court appears to be an ***exact photocopy of the entire signature page*** of a different contract for another song "Whatever Will Be Will Be, aka Que Sera Sera", the termination of which is also at issue in this litigation. *See* **Collective Exhibit A**, *"What a Deal" Contract, Assignment, and Termination Notice; Cf.* **Collective Exhibit B**, *"Whatever Will Be Will Be (aka Que Sera Sera)" Contract, Assignment, and Termination Notice*.

> ii. **The 2000 Agreement only extended the copyright assignments Jay could have in his individual capacity.**

Defendants' Motion to Dismiss erroneously argues "the 2000 Agreement validly extended the terms of the copyright assignments. As discussed above, Jay Livingston could not grant rights in the year 2000 (in his individual capacity) that he and/or his deceased spouse previously granted away. The principle that one cannot convey assets that one does not have is referred to as "nemo dat quod non habet" in Latin, which means "no one gives what they do not have." This principle is well-established black letter property law.

Further, contrary to Defendants' assertion the California Probate Court did *not* enter an order that dispelled any doubt that the 2000 Agreement validly extended the terms of the assignments to JLM. The March 6, 2003, Probate Court Order (ECF No. 28-3) Defendants cite merely states: "THE FAMILY TRUST holds no publishing royalty interests and no copyright

---

[5] To that end, "What a Deal" is not mentioned in the July 15, 1984 Agreement, either. Notwithstanding, the copyright grant Defendants seek to terminate for "What a Deal", Copyright Document # V9955D573, states that it was executed on July 15, 1984, though it uses a different form than all the other assignments executed that day. The What a Deal assignment also states that it was executed by Jay Livingston in Davidson County, Tennessee. All of the other assignments executed by Jay Livingston on July 15, 1984 state that they were executed in Los Angeles, California. Moreover, the assignment for "What a Deal" was not registered with the U.S. Copyright Office until after Jay Livingston's death notwithstanding its July 15, 1984 execution. Plaintiff reserves the right to supplement this response memorandum as additional facts come to light regarding the copies of the "What a Deal" and Whatever Will Be Will Be (aka Que Sera Sera) contracts in the discovery process.

interests and all such interests ever owned by JAY or LYNNE are ***now*** owned by Jay Livingston Music, Inc. (emphasis added.) The California Probate Court makes absolutely no finding regarding the capacity of Jay Livingston's execution of any of the contracts. Just as importantly, by use of the word "now" the Court Order only speaks to Jay Livingston Music, Inc.'s ownership of the publishing royalty interests and no copyright interests as of March 3, 2023, a fixed point in time. The reversion rights referenced in Plaintiff's Second Amended Complaint did not arise until 2012.

      **iii.**      **The notices of termination do not reasonably identify the date of publication.**

Defendants' Motion to Dismiss erroneously argues "the notices of termination reasonably identified the date of publication." Defendants Motion simply ignores the fact that Jay Livingston did not in fact execute an "Exhibit B" for all of the songs Jay Livingston Music publishes. To that end, it simply ignores the fact that a Popular Song Writer Agreement and a Popular Songwriter Renewal Agreement have different terms and are therefore not interchangeable terms.

This is not harmless error pursuant to 37 CFR 201.10I because the failure to state the termination of the publishing agreement materially affects the information required to comply with Section 203 of the Copyright Act of 1976 (17 U.S.C. §203), and should destroy the validity of the notice of Termination, because it was not an error made in good faith, and was, in fact, an error made with the intention to deceive, mislead, or conceal relevant information from the public at large, in general, and specifically, in particular, Plaintiff Tammy Livingston in her capacity as a beneficiary and co-trustee of the Livingston Music Interests Trust, and, as beneficiary of the Tammy Livingston Music Interest Trust. Plaintiff does concede the precedent laid out under *Baldwin v. EMI* regarding the date of publication for works that have previously been published. However, even that is not dispositive of the issue.

By way of specific example, Defendants filed copyright terminations for the song, "Give It All You Got" that state the date of publication was July 15, 1984 but there are other copies of contracts and assignments that state the state of publication to be January 1, 1987. *See:* V9927D627: Terminates Songwriters Renewal Contract dated July 15, 1984. Give It All You Got. V9927D628: Terminates Assignment of Copyright dated July 15, 1984. There is an assignment July 15, 1984. However, there is also an assignment dated January 1, 1987, referencing a publishing agreement between the same parties. To that end, the May 18, 2000 Agreement only extends the "Give it all you got" executed on January 1, 1987. *See* **Collective Exhibit C**, *competing 1984 & 1987 Contracts, Assignments, and Notices of Termination for the song, "Give it All You Got".*

      **iv.**     **The notices of termination do not contain a complete and unambiguous statement of facts required to be contained in the notice.**

Defendants' Motion to Dismiss erroneously argues "the notices of termination contain a complete and umabigous statement of facts required to be contained in the notice." As described more fully in Plaintiff's Second Amended Complaint, Travilyn's Notices of Termination, failed to include the required clear identification identifying the grant to be terminated in the form of a complete and unambiguous statement of facts reasonably identifying the grant to which the Notices of Termination applies as required by 17 U.S.C. § 203 and 37 C.F.R. 201.10(b)(2) and (3), because the applicable Termination Notices failed to mention that the grants were subject to "the mutual covenants, promises, and undertakings set forth in the Publishing Agreement between the undersigned and the assignee hereunder Jay Livingston dated July 15, 1984," with respect to the applicable songs referred to therein, which publishing agreements terminated in accordance with their terms on or about December 31, 2011, and were thus not capable of termination pursuant to 17 U.S.C. §203, at the time the applicable Notices of Termination were filed. Further, the apparent

9

misstatement of the date of publication creates confusion and doubt as to the grant being terminated, again adding to the failure of Defendants to meet the required clear identification of the grant to be terminated.

    **v.    The May 2000 Agreement constituted a new grant.**

Defendants Motion to Dismiss erroneously argues: "The 2000 Agreement amended the AGAC Agreements, so it was not a "new grant". Discussed more fully in Plaintiff's Second Amended Complaint and above, The May 18, 2000 Agreement described, signed by Jay Livingston, in his individual capacity, and in which he was named a party solely in his individual capacity, and not as a trustee, constituted a second grant by author Jay Livingston, or a renegotiated grant with respect to the songs referred to in the May 18, 2000 Agreement (i.e., second grant or renegotiated grant, after the initial grants by Jay Livingston contained in the Renewal Agreements) which were not capable of termination pursuant to 17 U.S.C. §203 at the time the applicable Notices of Termination were filed.

Further, The May 18, 2000 Agreement substituted the rights and obligations of Jay Livingston Music for Jay Livingston Music, inc. "Novation is the substitution of a new obligation for an existing one." Cal. Civ. Code § 1530 (West). According to Cal. Civ. Code § 1531 (West):

> Novation is made: 1. By the substitution of a new obligation between the same parties, with intent to extinguish the old obligation; 2. By the substitution of a new debtor in place of the old one, with intent to release the latter; or, 3. By the substitution of a new creditor in place of the old one, with intent to transfer the rights of the latter to the former.

Cal. Civ. Code § 1531 (West).

Jay Livingston entered into several music publishing contracts with an unincorporated entity known as "Jay Livingston Music". As discussed in Plaintiff's Second Amended Complaint, Jay Livingston assigned all of this assets to the family Trust in 1985. The family Trust was not a

party to the May 18, 2000 Agreement, which Jay executed in his individual capacity.

      **vi.    The AGAC Agreements only had 28-year terms and are thus not capable of termination.**

Even if it were determined, arguendo, that Jay's signature in his individual capacity were somehow deemed to be a grant by the Trusts to JLM and by Jay in his capacity as Trustee, such a grant would be a grant by a person other than an author, i.e., the Trusts. Grants by persons other than authors are not subject to termination under Section 203(a) of the 1976 Copyright Act (17 U.S.C. § 203). Additionally, for the reasons discussed above, Defendants arguments regarding the 28 year term are unavailing.

      **vii.    Jay Livingston originally assigned the copyrights to his d/b/a Jay Livingston Music *aka* himself.**

The Renewal Agreements and the Initial Term Agreements by and between Jay Livingston and Jay Livingston Music constituted grants by Jay Livingston, to Jay Livingston Music, a proprietorship owned by Jay Livingston. ECF No. 46 at pp. 5;19. Defendants' Motion alleges that Plaintiff's Second Amended Complaint fails because Travilyn Livingston owned JLM. In support, Defendants have merely proffered a document that is an agreement to agree (the "1984 Agreement"). Crucially, the date of execution is not provided anywhere on the document. Morever, the 1984 Agreement is not a document of title or transfer. It merely states that Travilyn Livingston is the owner of a music publishing company known as Jay Livingston Music *"as of July 15, 1984"* (emphasis added). Plaintiff does not dispute that Travilyn Livingston worked with Jay Livingston to commercially exploit his songs through his sole proprietorship Jay Livingston Music. As noted above, the March 6, 2003 California Probate Court Order makes no finding other than Jay Livingston Music Inc., owning all the publishing royalty and copyright interests as of March 6,

2003. However, a fundamental question of fact remains as to **_when_** Travilyn Livingston came to own it and whether she in fact owned it at the time Jay Livingston entered into contracts with it.

To that end, Jay Livingston's own lawyer testified under oath on September 19, 2002:

> For a number of years, my firm represented Jay Livingston, as his estate planning attorneys. My firm prepared for Jay, among other documents, The Twelfth Amendment and Restatement of The Survivor's Trust Created Under the The Jay and Lynne E. Livingston Family Trust of 1985. In connection with the preparation of that document, Jay expressed some concerns concerning his copyrights to songs he had composed. As a result of those concerns, upon my advice, the office of the "Music Interest Trustee" was established in the Survivor's Trust.
>
> "***Jay, on the other hand, had indicated to me that he had retained the copyrights and publisher royalty rights to a substantial number of his songs. So he had the responsibility of promoting and licensing the compositions to record companies, radio stations, ad agencies, television and film producers, and various institutions for uses in live performances***. Jay wanted to ensure that his successor in that role had the knowledge to carry it out to achieve the greatest benefit to his family. He believed that only family members, whom he did not wish to burden with the general trusteeship, had the requisite knowledge.
>
> ***At the time the Twelfth Amendment was prepared, Jay was in the process of disposing of his copyrights and publisher royalty rights, intending to retain only the songwriter royalties***. However, without having hired copyright counsel, it was unclear what exploitation and management rights would remain. In order to handle the contingency, that any of those rights remained, the Music Interests Trust was created. Following Jay's death, copyright counsel was retained and gave the opinion that all of Jay's copyrights and publisher royalty rights had been effectively sold and that nothing remained but the songwriter royalties. (Emphasis added.)

ECF No. 24-2, *Declaration of Alan S. Watenmaker*, Executed September 19, 2002

The Twelfth Amendment to the Jay and Lynne E. Livingston Trust of 1985 was signed on December 12, 2000. Mr. Watenmaker specifically stated that "[a]t the time the Twelfth Amendment was prepared, Jay was in the process of disposing of his copyrights and publisher royalty rights, intending to retain only the songwriter royalties." *Id.* Mr. Watenmaker also specifically stated, "Jay,

on the other hand, had indicated to me that he had retained the copyrights and publisher royalty rights to a substantial number of his songs. So he had the responsibility of promoting and licensing the compositions to record companies, radio stations, ad agencies, television and film producers, and various institutions for uses in live performances." *Id.* These statements facially tend to indicate that Jay Livingston (and/or the Family Trust he assigned all of his assets to on August 28, 1985) owned Jay Livingston Music long after July 15, 1984.

Similarly, a December 4, 1985 newspaper article published in the Los Angeles Times, featuring an interview with Jay Livingston states as follows:

> Nonetheless, they remain relatively active, writing special material for Bob Hope (an "old relationship"), doing charity shows and, in Livingston's case, **overseeing *his* music publishing company in Nashville, Tenn., run by his daughter, Travilyn**. Meanwhile, the composers continue to cash in on former glories. (Emphasis added.)
>
> 'Financially, this has been the best year we've ever had,' Livingston said. "Our songs are selling like crazy. Willie Nelson recorded "Golden Earrings," "To Each His Own" and "Mona Lisa." It's not as much fun, but financially we're not complaining." A recently signed one-year contract with Honda, giving the automotive company rights to "Que Sera Sera" (melody only), brought the writers a tidy $100,000. Portions of the popular ballad, sung by Doris Day in "The Man Who Knew Too Much," can be heard in a current TV commercial . . . but only if you listen closely. "It's played quietly in the background," Livingston said, shrugging indifferently.

ECF No. 24-3, *Composers Livingston, Evans Keep "Em Humming, Jack Hawn*, The Los Angeles Times, Decemeber 4, 1985, available at https://www.latimes.com/archives/la-xpm-1985-12-04-ca-710-story.html. As such, there is a significant question of material fact as to when Travilyn Livingston came to own Jay Livingston Music.

    **viii.** **The notices of termination do not reasonably identify the grants being terminated.**

The notices of termination do not reasonably identify the grants being terminated. By way

13

of specific example, Defendants filed copyright terminations for the song, "Give It All You Got" that state the date of publication was July 15, 1984 but there are other copies of contracts and assignments that state the state of publication to be January 1, 1987. *See:* V9927D627: Terminates Songwriters Renewal Contract dated July 15, 1984. Give It All You Got. V9927D628: Terminates Assignment of Copyright dated July 15, 1984. There is an assignment July 15, 1984. However, there is also an assignment dated January 1, 1987, referencing a publishing agreement between the same parties. To that end, the May 18, 2000 Agreement only extends the "Give it all you got" executed on January 1, 1987. *See* **Collective Exhibit C**, *competing 1984 & 1987 Contracts, Assignments, and Notices of Termination for the song, "Give it All You Got"*.

The Court in *Mtume v. Sony Music Entm't*, 408 F. Supp. 3d 471, 472 (S.D.N.Y. 2019) analyzed a similar issue and found:

> "Issue of whether incorrect date of termination notice was harmless error could not be resolved at motion to dismiss phase of musician's action for declaratory relief, copyright infringement, and accounting against record label, because of factual disputes as to whether record label was on notice of which recordings were covered by termination notice, whether different date of execution would have materially affected application of termination provisions, and whether any mistake as to date of execution was made in good faith. 17 U.S.C.A. SS 203, 304; Fed. R. Civ. P. 12(b)(6); 37 C.F.R. SS 201.10(e)(1), 201.10(e)(2)."

Court in *Mtume v. Sony Music Entm't*, 408 F. Supp. 3d 471, 472 (S.D.N.Y. 2019).

**B.      Plaintiff would be entitled to receive songwriter royalties even if the terminations were valid.**

Contrary to Defendants assertion, assuming *arguendo*, the Terminations were Valid Under Federal Copyright Law, Plaintiff Would Still be Entitled to Receive and Collect Royalties Emanating From the Exploitation of the JLM Song Catalog. As stated above, the May 18, 2000 Agreement was an agreement to which Jay was a party *in his individual capacity only*, not in his

capacity as Trustee. The May 18, 2000, Agreement was thus a binding enforceable agreement under state law between Jay, individually, and Jay Livingston Music, Inc.

Paragraph 2 of the May 18, 2000 Agreement states: "Corporation agrees to be bound by and to perform all of the terms and conditions of the AGAC Contracts to be performed on the part of Publisher." ECF No. 17-4 at p. 20 of 26. There are no conditions to the obligations of Jay Livingston Music, Inc., a California corporation, later merged into Jay Livingston Music, Inc., a Tennessee corporation, as the surviving entity, effective March 2, 2017 per the online records of the Tennessee Secretary of State.[6] As the survivor, Jay Livingston Music, Inc., assumed as a matter of law all liabilities of the merged California corporation, Jay Livingston Music, Inc.

Following the stated "effective date" of each copyright termination notice, Travilyn Livingston subsequently assigned certain copyright interests back to Jay Livingston Music, Inc. *See* ECF No. 17 ¶ 54. By way of example, Travilyn Livingston re-assigned *Whatever Will Be, Will Be, (Que Sera, Sera)* to Jay Livingston Music Inc. on July 15, 2019.[7]

Pursuant to Section 203 of the Copyright Act: "Termination of a grant under this subsection affects only those rights covered by the grant that arises under the Copyright Act, and in no way affects rights arising under any other Federal, State, or foreign laws." 17 U.S.C. § 203 (b)(6). The binding agreement between Jay and Jay Livingston Music, Inc., creates rights under state law that would not be subject to termination, even if the terminations were somehow effective under federal copyright law. Thus, even if the terminations were effective for purposes of federal copyright law, Jay Livingston Music, Inc. would remain obligated "to perform all of the terms and

---

[6] https://tnbear.tn.gov/Ecommerce/FilingDetail.aspx?
[7] *See*
https://cocatalog.loc.gov/cgibin/Pwebrecon.cgi?v1=25&ti=1,25&Search%5FArg=Jay%20Livingston%20Music%20Inc&Search%5FCode=NALL&CNT=25&REC=0&RD=0&RC=0&PID=pUP_OwxouPndyCI_dxMNKNs-iWrSwIS&SEQ=20221021210635&SID=3

conditions of the AGAC Contracts to be performed on the part of Publisher," pursuant to the May 18, 2000 Agreement. Based on the assumption of the publisher's obligations under the AGAC Contracts contained in the May 18, 2000 Agreement, and the re-assignment of the applicable copyrights, for example, *Whatever Will Be, Will Be, (Que Sera, Sera)*, Jay Livingston Music, Inc. would remain obligated to pay royalties under the AGAC Contracts and Plaintiff would have the right to collect and receive royalties, because such obligations are "rights arising under any other Federal, State, or foreign laws." 17 U.S.C. § 203 (b)(6). To that end such obligation would remain even as to musical compositions not re-assigned to Jay Livingston Music, Inc. after a hypothetical effective termination by Travilyn Livingston under federal copyright law.

Defendants further state that there is no controversy because they do not dispute that Plaintiff retained her right to receive royalties from her grandfather's trusts. Defendants statement fails to admit that Plaintiff is also entitled to receive the right to receive royalties from the Tammy Livingston Music Trust created under the Lynne Music Interest Trust. Defendants assert in their Motion to Dismiss "[t]his claim, too, fails as a matter of law because, after termination, only Travilyn would own the copyrights. JLM would no longer own the copyrights, so no royalties would flow into Jay's trusts pursuant to the Popular Songwriters Renewal Contracts."

Defendants seem to imply that their willingness to acknowledge the express right to **receive** royalties under the trust is dispositive. This cute argument ignores the purpose of Travilyn Livingston's filing of the copyright terminations is an effort to terminate the legal obligation to **pay** royalties to the trust and has nothing to with Plaintiff's right to **receive** these royalties under the terms of the Trust.

Thus, Defendants' Motion To Dismiss states the very controversy for which Plaintiff seeks this Declaratory Judgment, *i.e.*, Defendants believe that, assuming, *arguendo*, that the terminations

filed by Travilyn are valid, JLM would no longer own the copyrights, so no royalties would flow into Jay's trusts pursuant to the Popular Songwriters Renewal Contracts." Accordingly, a real controversy exists and Plaintiff's interests are clearly within the zone of protected interests. See *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1124 (9th Cir. 2015) (holding, "Termination, if effective, would directly extinguish the Foundation's right to receive prospective royalties from the current grants. Far from barring the Foundation's suit, the proximate cause test suggests that the Foundation is indeed a party 'whose injuries [may have been] proximately caused by violations of the statute.'" (Internal citation omitted.)

C.  **Plaintiff is entitled to a constructive trust.**

Plaintiff is entitled to a constructive trust. Defendants' Motion to Dismiss mischaracterizes the relief Plaintiff seeks in her Second Amended Complaint. (ECF No. 46) Plaintiff seeks constructive trust as remedy pursuant to the declaratory relief Plaintiff also seeks. *See* ECF No. 46 at pp. 50-51, ¶ (m); p. 45 at ¶ (xiii). Plaintiff avers that she is entitled to declaratory relief, and such a constructive trust is necessary to ensure Defendants do not dissipate or otherwise dispose of the assets at issue, particularly in light of Defendants efforts to conceal financial information related to the flow of royalties into the Family Trusts and/or their refusal to provide Plaintiff with any information related to their actions with regard to the notices of termination at issue despite her lawful requests for the same as a Beneficiary and Co-Trustee of the Livingston Music Interest Trust.

IV. **CONCLUSION.**

For the foregoing reasons, Plaintiff respectfully requests that Defendants' pending Motion to Dismiss (ECF No. 49-50) be denied.

This 3rd day of May 2023.

                                              Respectfully Submitted By:

                                              /s/Jonathan M. Wolf

                                              Jonathan M. Wolf #35445
                                              JONATHAN M. WOLF, PLLC
                                              1515 Demonbreun St. Suite 1408
                                              Nashville, TN 37203
                                              Jonathan@wolf.lawyer
                                              615-422-5545

                                              *Counsel for Plaintiff Tammy Livingston*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing has been forwarded via the District Court E-File system, to the following on May 3, 2023.

Tim Warnock (#12844)
Keane Barger (#33196)
LOEB & LOEB LLP
35 Music Square East, Suite 310
Nashville, TN 37203
twarnock@loeb.com
kbarger@loeb.com

*Attorneys for Defendants*

                                              **/s/ Jonathan M. Wolf**
                                              Jonathan M. Wolf, Esq.