UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| TAMMY LIVINGSTON, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | No. 3:22-cv-00532 |
|  | ) |  |
| JAY LIVINGSTON MUSIC, INC., et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## MEMORANDUM OPINION

This case concerns the rights to a prolific composer's music, a dizzying estate plan, and two descendants at odds over how to manage the royalties those compositions earn. In 2015, Defendant Travilyn Livingston ("Travilyn") began filing notices to terminate publishing and copyright grants her father, Jay Livingston ("Jay"), entered into with the predecessor to Defendant Jay Livingston Music, Inc. ("JLM") beginning in 1984. Travilyn's daughter, Plaintiff Tammy Livingston ("Tammy"), has, for decades, enjoyed a portion of the royalties these compositions have earned and fears that, on account of the grant terminations, she may lose some amount of that income. Accordingly, Tammy brought this action seeking a declaration that Defendants' copyright termination notices are invalid under Section 203 of the Copyright Act of 1976, 17 U.S.C. § 203 ("Section 203" or "§ 203"), or, if the termination notices are deemed valid, that she remains entitled to certain royalties. (Doc. No. 46 at 7–8). Pending before the Court is Travilyn and JLM's Motion to Dismiss the Second Amended Verified Complaint (Doc. No. 49). For the following reasons, Defendants' Motion will be granted.

## ALLEGED FACTS AND BACKGROUND

The Court relies on the relevant factual allegations from the Second Amended Verified Complaint (Doc. No. 46) and assumes they are true for purposes of ruling on the instant motion. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

Jay Livingston married his first wife, Lynne, in 1947. (Doc. No. 46 ¶ 1). Over the course of their marriage, Jay self-published many of his compositions through an unincorporated sole proprietorship, Jay Livingston Music (the "DBA"). (Id. ¶ 47). At some point, the DBA "became owned by Travilyn." (Doc. No. 46 ¶ 2). Although the parties dispute the precise date Travilyn took control of the DBA, Tammy's Collective Exhibit D to the Second Amended Verified Complaint indicates that she became the owner sometime before July 15, 1984. (See Doc. No. 39-4 at 5 (specifying that "Travilyn Livingston is the sole owner of the music publishing company known as 'Jay Livingston Music'")).

As of that date, Jay and the DBA executed an agreement (the "1984 Agreement"), in which Jay "assign[ed] to [the DBA] his copyright interest" in several specified compositions and agreed to "use reasonable efforts to assign to [the DBA] his copyright interest in musical compositions which he hereafter own or controls." (Id. at 5–8). The agreement further contemplated entering into separate, attached form agreements specific to each assigned composition. (Id. at 5). The 1984 Agreement referred to these separate attached agreements as "Popular Songwriters Agreements", but the actual attachments were titled "Popular Songwriters Renewal Contract." (Id. at 5, 9). Tammy asserts that the Popular Songwriters Agreement—which are not before the Court—and the Popular Songwriters Renewal Contracts are distinct form agreements with distinct terms, (Doc. No. 46 ¶ 50), but concedes that "Jay [] executed a ['Popular Songwriters Renewal Contract'] for each of the songs that Jay Livingston Music pu[bl]ishes." (Id. ¶ 51 n.23). Pursuant

2

to the terms of the Popular Songwriters Renewal Contract, Jay sold, assigned, transferred, and delivered to the DBA "any and all rights and interests whatsoever now and at any time or times hereafter known or in existence which he now possesses or which he may at any time or times hereafter acquire or possess . . . for the period of 28 years . . . and subject to the terms of this contract." (Id. ¶ 52 (quoting Doc. No. 39-4 at 9)). Contemporaneously, Jay and Jay Livingston Music executed a companion assignment of copyright to Jay Livingston Music for each composition subject to a Popular Songwriters Renewal Contract to effectuate that agreement ("Companion Assignment"), dated as of the same date of the Popular Songwriters Renewal Agreement for each composition. (Id. ¶ 93). These Copyright Assignments did not specify their duration. (See Doc. No. 52-2 at 7).

On August 28, 1985, Jay and Lynne formed the Jay and Lynne E. Livingston Family Trust of 1985 (the "Family Trust"), (Doc. No. 46 ¶¶ 10–11), to which they transferred "all right, title and interest of . . . their assets, whether real or personal." (Id.; Doc. No. 39-1 at 39). Upon either Jay or Lynne's death, the Family Trust directed the trustee to allocate the trust estate into three separate trusts: the Survivor's Trust, the Residual Trust, and the Music Interest Trust. (Doc. No. 39-1 at 3–7). The Survivor's Trust would be made up of Jay and Lynne's interest in the community estate, any separate and quasi-community estate, and the "entire remaining balance of the Trust Estate" subject to certain provisions to ensure that, among other things, no federal estate tax would apply. (Id. at 4). The Residual Trust would consist of any remaining balance and "any policy of life insurance on the life of the Surviving Settlor and which is contained in the Trust Estate, and which constitutes a separate or quasi-community property of the Deceased Settlor." (Id.). The Music Interest Trust would consist of "any and all of the Deceased Settlor's right, title, and interest as a composer of musical compositions, including but not limited to copyrights, all composer

3

royalties from ASCAP and other performing rights societies, music publishers, record companies, motion pictures, stage productions, television programs, etc. and from all contracts pertaining thereto." (Id. at 7). During the life of the surviving spouse, the Music Interest Trust would be divided into two shares: (1) the Spousal Share, consisting of 80% of the trust; and (2) the Share for Issue, consisting of 20% of the trust. (Id. at 11). At least quarterly, the income from the Music Interest Trust would be distributed to the beneficiaries. (Id.). Predictably, the Spousal Share's income would go to the surviving spouse. (Id. at 12). The Share for Issue's income would be split evenly between Travilyn and Tammy. (Id.). When Lynne died in 1991, (Doc. No. 46 ¶ 10), the Survivor's Trust, Residual Trust, and Music Interest Trust were created.

Jay married his second wife, Shirley, in 1992, (Doc. No. 46 ¶ 31), but the relevant provisions of the Family Trust remained unchanged for several years.

On May 18, 2000, Jay entered into another agreement (the "May 2000 Agreement") with a California company, Jay Livingston Music, Inc.—the DBA's successor in interest and JLM's predecessor. (Doc. No. 39-5 at 2). That agreement acknowledged that Jay and the DBA had entered into various Popular Songwriter Agreements and that, in an agreement formed a month prior (the "April 2000 Agreement"), the DBA had assigned all of its right, title and interest in all of the songs listed in an attached Exhibit A, "together with all of the [agreements] in respect to such songs, to Jay Livingston Music, Inc." (Id.). It then ratified the assignment of those agreements and amended every referenced agreement "to replace the fixed term of years as set forth in each [agreement] with a term equal to the entire term of copyright, including all renewals and extensions thereof, in each song." (Id. at 3).

Seven months later, on December 12, 2000, Jay executed the Twelfth Amendment and Restatement of the Survivor's Trust Created Under the Jay and Lynne E. Livingston Family Trust

4

of 1985 (the "12th Amendment"). (Doc. No. 39-1 at 41–84). As part of the 12th Amendment, Jay transferred all his assets to the Survivor's Trust, a except for a handful of specified assets, such as copyrights, renewal rights, termination rights, and "similar rights." (Id. at 83). The 12th Amendment also provided for the creation of a Marital Trust following Jay's death. (Id. at 49). The Marital Trust would include Jay's right, title and interest as a composer of musical composition (Jay's "Music Interest") except those which may belong to the Music Interest Trust established under the Family Trust upon Lynne's death. (Id. at 50).

On October 2, 2001, Jay executed the Thirteenth Amendment and Restatement of the Survivor's Trust Created Under the Jay and Lynne E. Livingston Family Trust of 1985 (the "13th Amendment"). (Id. at 86–96). This replaced portions of the 12th Amendment concerning the administration of the Music Interest in the Marital Trust. (Id. at 87). Specifically, it dictated that, upon Shirley's death, 10% of Jay's Music Interest would be held in a separate trust and distributed to Jay's brother; and that the remaining 90% would be held in another separate trust, with equal share of the income distributed to Tammy and Travilyn. (Id. at 92).

Just two weeks later, on October 17, 2001, Jay died, (Doc. No. 46 ¶ 8), and his Music Interest went to the newly formed Marital Trust pursuant to the 12th Amendment. In 2013, Shirley died, (id. ¶ 30), triggering the provisions in the 13th Amendment.

On March 6, 2003, a California probate court entered an order approving a petition by the Trustee of the Family Trust, Gary Kress. (Doc. No. 28-1 at 3). The petition asserted that Jay had executed the April 2000 Agreement and the May 2000 Agreement in both his individual capacity and his capacity as Trustee of the Family Trust, and that the April 2000 Agreement "sold certain of Lynne's Music Interests Trust's interest . . . in the balance of his songs."[1] (Doc. No. 39-3 at

---

[1] On this issue, the petition stated in full:

5

Case 3:22-cv-00532   Document 79   Filed 02/21/24   Page 5 of 19 PageID #: 1339

19). The probate court's order established that the Family Trust "holds no publishing royalty interests and no copyright interests and all such interests ever owned by J[ay] or L[ynne] are now owned by Jay Livingston Music, Inc." (Doc. No. 28-1 at 3). Attorneys for both Travilyn and Tammy signed this order. (Id.)

On May 28, 2015, Travilyn served two notices of termination under § 203 seeking to terminate grants related to the song, "Whatever Will Be Will Be (a.k.a. Que Sera, Sera)," (hereinafter, "Que Sera, Sera") on JLM. (Doc. No. 46 ¶ 100). The first notice informed JLM that Travilyn, as Jay's surviving daughter, sought to terminate the grant of "[a]ll right, title and interest

---

69. On May 18, 2000 JAY and Jay Livingston Music, Inc. entered into a written agreement (the "May, 2000 Agreement"). The May, 2000 Agreement confirmed the terms of the series of sale agreements between the parties with respect to certain songs, which had been made on various dates between March 15, 1984 and February 28, 2000. On April 14, 2000, Jay and Jay Livingston Music, Inc. entered into two agreements in which Jay sold certain of Lynne's Music Interests Trust's interest and the SURVIVOR's TRUST's interest in the balance of his songs, i.e., the publisher's royalty interest and the copyrights, to Jay Livingston Music, Inc., reserving the right to receive the songwriter's royalty (the "April, 2000 Agreement").

70. Jay did not specifically sign the May, 2000 Agreement or the April, 2000 Agreement in his capacity as Trustee. However, Petitioner believes that the May, 2000 Agreement covers both interests in songs that had been sold during Lynne's lifetime, which were clearly completed transfers, and songs that had been sold after Lynne's death. All songs, i.e., those transferred prior to Lynne's death and those transferred after, were treated equally in the April, 2000 Agreements. Further the parties conducted themselves as though all of the copyrights and publisher's royalty interests in the relevant songs had been fully transferred, both as to the SURVIVOR's TRUST's interest and Lynne's Music Interests Trust's interest.

71. Jay Livingston Music, Inc. claims that all publishing royalty interests and all copyright interests in every song ever owned by JAY or LYNNE were transferred pursuant to the two series of agreements, as confirmed by the May, 2000 and pursuant to the April, 2000 Agreements. Petitioner does not dispute this claim and requests an Order of the Court that the FAMILY TRUST holds no publishing royalty interests and no copyright interests, and that all such interests ever owned by Jay or Lynne are now owned by Jay Livingston Music, Inc.

(Doc. No. 39-3 at 19).

under copyright in the Composition granted or transferred in the Popular Songwriter[ Renewal] Contract between Jay Livingston Music and Jay Livingston dated July 15, 1984 and the amendment thereto dated May 18 2000." (Doc. No. 1-6 at 5). The second sought to terminate "all right, title and interest in copyright or of any right under copyright in the Composition granted or transferred in the [Companion] Assignment between Jay Livingston and Jay Livingston Music dated July 15, 1984." (Doc. No. 52-2 at 17). Because JLM's current CEO is Travilyn's husband, the notice was addressed to him at their shared home. (Doc. Nos. 1-6 at 4, 46 ¶ 101). Soon after, the notices were recorded in the United States Copyright Office. (Doc. Nos. 1-6 at 1; 52-2 at 15). Since then, Travilyn has filed notices seeking to terminate grants made pursuant to Popular Songwriter Renewal Contracts ("Termination Notices") and notices seeking to terminate grants made pursuant to Companion Assignments ("Companion Termination notices") for several of Jay's other compositions. (See Doc. No. 39-6).

Rather than simply say "Que sera, sera," on July 14, 2022, Tammy brought the instant action asserting a single cause of action for declaratory relief. (See generally Doc. No. 1). Now, on her third iteration of the complaint, Tammy seeks a declaration from the Court that the notices of termination are "defective, ineffective, and invalid under [§ 203]" for eleven reasons. (Doc. No. 46 ¶ 158). In the alternative, "if the court finds any or all of the [notices] valid and effective," Tammy seeks a declaration that the grants' terminations do not affect her right to receive the royalties from Jay's compositions is not affected by the grants' terminations. (Id. ¶ 158(l)). In either case, she requests that "a constructive trust be placed upon all of the assets of JLM prohibiting Defendants from transferring any or all of its assets to any person or entity to avoid payment of amounts properly due to [Tammy] in her capacity as a beneficiary of any of the [t]rusts or in her capacity as Co-Trustee of any of the [t]rusts." (Id. ¶ 158(m)). Defendants jointly moved

7

to dismiss the Second Amended Verified Complaint, (Doc. No. 49), and their Motion is now ripe for review. (Doc. Nos. 50, 51, 55).

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the complaint must include a 'short and plain statement' of the claim showing that the pleader is entitled to relief.'" Ryan v. Blackwell, 979 F.3d 519, 524 (6th Cir. 2020). In determining whether a complaint meets this standard, the Court must accept all the factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018). Accordingly, the complaint must "contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." Eidson v. Tenn. Dep't of Children's Servs., 510 F.3d 631, 634 (6th Cir. 2007) (citing Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005)). The Court will not accept a legal conclusion masked as a factual allegation, nor an "unwarranted factual inference," as true. Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007).

## ANALYSIS

The Second Amended Verified Complaint is a morass of argument and legalese. However, the parties' briefing does much to reveal the actual dispute. Tammy's statement of her claim and her prayer for relief lay out eleven purported reasons why Travilyn's notices of termination fail under Section 203. (Doc. No. 46 at 51–55). Defendants, in their Memorandum in Support of the Motion to Dismiss, consolidate those eleven arguments to eight. (Doc. No. at 8). Rather than oppose or object to this maneuver, Tammy likewise narrowed her eleven arguments to eight. (See

8

Case 3:22-cv-00532   Document 79   Filed 02/21/24   Page 8 of 19 PageID #: 1342

generally Doc. No. 51 (addressing only those eight arguments)). The Court will address these eight before turning to Tammy's ancillary arguments.

I. **The Complaint Fails to Adequately Allege that the Notices of Termination are Invalid Under Section 203.**

When Congress amended the Copyright Act in 1976 to create a termination right, it authorized the author of a work (or his successors) "to undo a prior transfer of his copyright and recapture all interests in the copyright for himself." Brumley v. Albert E. Brumley & Sons, Inc., 822 F.3d 926, 928 (6th Cir. 2016). For works transferred on or after January 1, 1978, the author or his statutory successors may, pursuant to § 203, terminate the transfer between 35 and 40 years after the date the copyright was assigned to a third party. 17 U.S.C. § 203(a)(3). This termination right may be exercised "notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." 17 U.S.C. § 203(a)(5). Based on this language, the termination right created by § 203 has repeatedly been characterized as "inalienable." See, e.g., N.Y. Times Co. v. Tasini, 533 U.S. 483, 497 (2001); Stewart v. Abend, 495 U.S. 207, 230 (1990).

"Termination is not automatic." Waite v. UMG Recordings, Inc., 450 F. Supp. 3d 430, 434 (S.D.N.Y. 2020). It must be effected by a termination notice which: (1) "may be served between two and ten years before the termination date," and must (2) "state the effective date of the termination"; (3) "be recorded in the Copyright Office 'as a condition to its taking effect'"; and (4) "comply with various other formalities prescribed by regulation" under 37 C.F.R. § 201.10. Baldwin v. EMI Feist Catalog, Inc., 805 F.3d 18, 32 (2d Cir. 2015) (quoting 17 U.S.C. § 203(a)(4)).

Tammy offers the following eight unique arguments to support her claim that the termination notices were "defective, ineffective, and invalid": (1) that the notices seek to terminate grants that expired by their own terms 28 years after their execution, (Doc. No. 46 ¶¶ 156(a), 156(i)); (2) that, because Jay and Lynne assigned their assets to the Family Trust in 1985, Jay was

9

incapable of extending the term of any grant through the May 2000 Agreement, (id. ¶¶ 156(b), 156(h)); (3) that the May 2000 Agreement constituted a second grant rather than an amendment to each grant, (id. ¶ 156(e)); (4) that any grant by Jay in his capacity as a trustee does not constitute a grant by the author terminable under § 203, (id. ¶ 156(f)); (5) that the 1984 Agreement and the related agreements between Jay and the DBA are not terminable because they were grants from Jay to himself, (id. ¶ 156(g)); (6) that each notice fails to clearly identify the grant to be terminated, (id. ¶¶ 156(d), 156(j)); (7) that each notice fails to identify the date of publication of the relevant composition, (id. ¶¶ 156(c), 156(d), 156(k)); and (8) that each notice lacks a complete and unambiguous statement of facts without incorporation by reference of information in other documents or records. (Id. ¶ 156(j)). The first five concern whether Travilyn has the authority to terminate the grants. The last three concern the substance of the individual notices.[2] The Court will address Tammy's two groups of arguments in turn.

### A. The Complaint Fails to Adequately Allege that Travilyn Lacks the Authority to Terminate the Grants.

Each of Tammy's five arguments that Travilyn lacks the authority to terminate the grants collapse under their own weight; either they expressly contradict documents Tammy placed squarely before the Court or they are entirely unmoored from the law.

Tammy's first and second arguments—that the grants terminated 28 years after their execution and that Jay was incapable of conferring any rights through the May 2000 Agreement—are contingent on the allegation that he signed the May 2000 Agreement in his individual capacity rather than as a trustee. (See Doc. No. 51 at 6–8). This issue was handled decisively by the

---

[2] The parties did not sequence their arguments in this manner. (See generally Doc. Nos. 50, 51, 55). However, for the sake of clarity, the Court will proceed in the order it has laid out.

California probate court. Tammy's Collective Exhibit C (Doc. No. 39-3) highlights this; there, the petitioner explained:

> On May 18, 2000, JAY and Jay Livingston Music, Inc. entered into a written agreement (the "May, 2000 Agreement"). The May, 2000 Agreement confirmed the terms of the series of sale agreements between the parties with respect to certain songs, which had been made on various dates between March 15, 1984 and February 28, 2000. On April 14, 2000, JAY and Jay Livingston Music, Inc entered into two agreements in which JAY sold certain of LYNNE's Music Interests Trust's interest and the SURVIVOR's TRUST's interests in the balance of his songs, i.e., the publisher's royalty interest and the copyrights, to Jay Livingston Music, Inc., reserving the right to receive songwriter's royalty (the "April, 2000 Agreements").
>
> JAY did not specifically sign the May, 2000 Agreement or the April, 2000 Agreements in his capacity as Trustee. However, Petitioner believes that the May, 2000 Agreement covered both interests in songs that had been sold during LYNNE's lifetime, which were clearly completed transfers, and songs that had been sold after LYNNE's death. All songs, i.e., those transferred prior to LYNNE's death and those transferred after, were treated equally in the April, 2000 Agreements. Further, the parties conducted themselves as though all of the copyrights and publisher's royalty interests in the relevant songs had been fully transferred, both as to the SURVIVOR's TRUST's interest and LYNNE's Music Interests Trust's interest.

(Doc. No. 39-3 at 19).[3] Based on these facts, the probate court approved the petition and determined that "the FAMILY TRUST holds no publishing royalty interests and no copyright interests and all such interests ever owned by JAY or LYNNE are now owned by Jay Livingston Music, Inc." (Doc. No. 28-1 at 3). Despite the probate court's order, which Tammy's attorney at the time signed, (id.), she now argues that "the California Probate Court makes absolutely no finding regarding the capacity of Jay Livingston's execution of any of the contracts." (Doc. No. 51 at 8). That is wrong; it approved the petition which, as excerpted above, unequivocally addressed Jay's capacity while executing the April 2000 Agreement and May 2000 Agreement.

---

[3] "Normally, the Court is restricted from the 'four corners' of the pleading; but the Sixth Circuit permits consideration of public records (such as relevant probate court proceedings) or other materials that are appropriate for the taking of judicial notice." Jackson v. Cleveland, 2015 WL 6163510, at *2 (N.D. Ohio. Oct. 20, 2015) (citing New England Health Care Emps. Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir. 2003)).

11

Indeed, the probate court's determination turns on the issue. Separately, and without elaboration, Tammy asserts that the probate court's use of the word "now" substantially narrows its order. (Doc. No. 51 at 8). When read in conjunction with the petition (Doc. No. 39-3 at 19), Tammy's favored reading is textually unpersuasive. Accordingly, Tammy's first and second bases for declaratory relief fail.[4]

In her third argument for declaratory relief, Tammy asserts that the May 2000 Agreement created new grants. In large part, she relies on the individual capacity argument the Court just rejected and need not retread. (See Doc. No. 51 at 10 (asserting that the May 2000 Agreement was "signed by Jay Livingston[] in his individual capacity . . . and not as a trustee")). But Tammy goes on, asserting that the May 2000 Agreement constitutes novation under California Civil Code § 1531. (Doc. No. 51 at 10). This is incorrect. None of the three situations that the provision contemplates apply here. According to California Civil Code § 1531, "[n]ovation is made: (1) by the substitution of a new obligation between the same parties, with intent to extinguish the old obligation; (2) by the substitution of a new debtor in place of the old one, with intent to release the latter; or (3) by the substitution of a new creditor in place of the old one, with intent to transfer the rights of the latter to the former." Cal. Civ. Code § 1531. There were no debtors or creditors in the May 2000 Agreement, nor were new obligations substituted for old ones by the parties. (Doc. No. 35-5 at 2). Rather, the May 2000 Agreement amended every referenced agreement "to replace the fixed term of years as set forth in each [agreement] with a term equal to the entire term of copyright, including all renewals and extensions thereof, in each song." (Id. at 3). Such

---

[4] In an aside, Tammy argues that because one song, "What a Deal", was not listed in the attachment to the May 18, 2000 Agreement or in the 1984 Agreement, it could not have been extended. (Doc. No. 51 at 7). For the reasons discussed later in this Memorandum Opinion, (see infra Section I.B), the Court will not entertain this argument.

12

amendments do not rise to the level of a "new obligation." See Fanucchi & Limmi Farms v. United Agri Prods., 414 F.3d 1075, 1081 (9th Cir. 2005) (explain that modifying only a portion of a contract does not constitute novation under California law). Accordingly, Tammy's third argument for declaratory relief fails.

As to Tammy's fourth argument, i.e., that any grant by Jay in his capacity as trustee is not terminable under § 203 as a grant by the author, Defendants respond that regardless of whether Jay entered into the May 2000 Agreement in his individual capacity or capacity as a trustee, the May 2000 Agreement extended the grants he made in his individual capacity. (Doc. No. 50 at 12). Accordingly, so say Defendants, the grants remain "executed by the author" and terminable pursuant to § 203. (Id.). In full, Tammy responds:

> Even if it were determined, arguendo, that Jay's signature in his individual capacity were somehow deemed to be a grant by the Trustees of JLM and by Jay in his capacity as Trustee, such a grant would be a grant by a person other than an author, i.e., the Trusts. Grants by persons other than authors are not subject to termination under Section 203(a) of the 1976 Copyright Act (17 U.S.C. § 203). Additionally, for the reasons discussed above, Defendants arguments regarding the 28-year term are unavailing.

(Doc. No. 51 at 11). Because Tammy's "response" goes no further than restating her conclusion, the Court considers Tammy's fourth argument conceded. ARJN #3 v. Cooper, 517 F. Supp. 3d 732, 750 (M.D. Tenn. 2021) ("Where a party fails to respond to an argument in a motion to dismiss the Court assumes he concedes this point and abandons the claim" (internal quotation marks and citation omitted)).

Tammy's fifth argument for declaratory relief asserts that the 1984 Agreement and the related agreements between Jay and the DBA are not terminable because they were grants from Jay to himself. However, Tammy does not point to any allegations in the Second Amended Verified Complaint, or offer any arguments in her briefing, as to why a grant from Jay to his DBA would not be terminable—regardless of who owned the entity at the time, (see generally Doc. No.

13

46, 51), and § 203's plain language does not limit termination rights based on the entity that the author initially granted his rights to. 17 U.S.C. § 203. The Court will not do this work for her. On this point, Tammy has failed to meet the bare pleading standard of including a "short and plain statement of the claim showing that [she] is entitled to relief." Blackwell, 979 F.3d at 524.

### B. The Complaint Fails to Adequately Allege that the Notices of Termination are Defective.

Tammy's three remaining arguments for declaratory relief all concern the substance of the Termination Notices and Companion Termination Notices enumerated in the Second Amended Verified Complaint (Doc. No. 46 ¶¶ 120, 137) and in Collective Exhibit F (Doc. No. 39-6 at 2–5). Each fails as a matter of law.

Tammy first argues that each notice lacks a brief statement reasonably identifying the grant to which it applies, thereby violating 37 C.F.R. § 201.10(b)(2)(v). Specifically, as alleged, the Que Sera, Sera Termination Notice's statement fails because it misidentifies the grant to be terminated as a Popular Songwriter Contract rather than a Popular Songwriters Renewal Contract.[5] (Doc. No. 46 ¶ 110). This allegation, however, flatly mischaracterizes the notice. The notice's introductory paragraph defines the term "Popular Songwriter's Contract" as "the Popular

---

[5] Tammy also argues that the Que Sera, Sera Termination Notice wrongly states that the May 2000 Agreement extended the agreement it seeks to terminate. (Doc. No. 46 ¶ 110). This merely repackages her argument that Jay signed the May 2000 Agreement only in his individual capacity. (See id. ¶ 110 ("Still further, the May 18, 2000 Agreement was not signed in the capacity of a Trustee. . . . Thus, the reference to the 'amendment thereto dated May 18, 2000', in the Notice of Termination is equally inaccurate.")). As already explained, that is wrong. (Supra Section I.A). Tammy attempts the same maneuver with regard to the Que Sera, Sera Companion Termination Notice. (See Doc. No. 46 at 127 ("Thus, at the time the grant sought to be terminated was made, it was thus subject to termination on July 15, 2012, and such grant was thus not capable of termination on July 15, 2019 as stated in the Notice of Termination, because the grant in both the assignment and the Publishing Agreement referred to therein, terminated in accordance with their respective terms on July 15, 2012.")). Again, the Court has already explained that this is wrong and will not retread old ground. (Supra Section I.A).

14

Songwriters Renewal Contract between Jay Livingston Music and Jay Livingston executed as of July 15, 1984, as amended by the agreement between Jay Livingston Music and Jay Livingston executed as of May 18, 2000, and with respect to the musical composition, [Que Sera, Sera]." (Doc. No. 17-1 at 4). The later use of that defined term is not a misidentification.

In her brief, Tammy makes no attempt to explain why the Que Sera, Sera Termination Notice or Companion Termination Notice do not reasonably identify the grants being terminated, instead electing to focus on notices relating to a different composition, "Give It All You Got." (Doc. No. 51 at 13–14). However, the allegations supporting this "specific example" were never pleaded. (See generally Doc. No. 46). By raising them for the first time here, Tammy highlights a significant shortcoming in the Second Amended Verified Complaint.

The allegations in the Second Amended Verified Complaint focus on the Termination Notice and Companion Termination Notice of a single composition—Que Sera, Sera. (See id. ¶¶ 100–119, 121–136 (discussing the alleged deficiencies with the Que Sera, Sera Termination Notice and Companion Termination Notice)). Only after walking through the alleged deficiencies with the composition's Termination Notice does Tammy assert that the reasons to discard that Termination Notice apply to all the other Termination Notices. (See id. ¶ 120 ("Similar to the [Que Sera, Sera] Termination Notice described above, each of the Notices enumerated below, are each defective, ineffective and invalid under 17 U.S.C. § 203 for all of the reasons stated above with respect to the Notice of Termination related to [Que Sera, Sera] and the Que Sera, Sera Agreement . . ."). She then repeats this process for the Companion Termination Notices. (See Doc. No. 46 ¶¶ 121–137 (discussing the Companion Termination Notice for Que Sera, Sera and stating that "similar to [that Companion Termination Notice], each of the Companion [] Termination Notices . . . is defective, ineffective, and invalid under 17 U.S.C. § 203")). Tammy

fails to make allegations specific to any other composition, Termination Notice, or Companion Termination Notice. (See generally id.). Accordingly, the Court must apply the allegations concerning Que Sera, Sera and its notices to the other compositions and their notices or apply none at all.

In effect, this means that composition- or notice-specific allegations raised for the first time in Tammy's brief (Doc. No. 51) cannot be considered. Bates v. Green Farms Condominium Assoc., 958 F.3d 470, 484 (6th Cir. 2020) ("If a complaint fails to state a claim . . . the plaintiff cannot cure the deficiency by inserting the missing allegations in a document that is not either a complaint or an amendment to a complaint." (internal quotation marks and citation omitted)). Likewise, any argument dependent on such facts cannot win the day. Thus, Tammy's argument that the notices do not reasonably identify the grants being terminated must fail.

Tammy's second argument is that each notice inappropriately uses the "date of publication of the work under the grant" in place of the actual date of publication and omits the actual date of publication as required by 17 U.S.C. § 203 and 37 C.F.R. § 201.10(b)(2)(iii). (Doc. No. 46 ¶¶ 156(c), 156(d), 156(k)). On this point, Tammy misreads the Que Sera, Sera Termination Notice and the federal regulation. The Que Sera, Sera Termination Notice does not purport to identify the original date of publication; it specifically identifies the "[d]ate of publication *under the grant*." (Doc. No. 17-6 at 5 (emphases added)). Pursuant to 37 C.F.R. § 201.10(b)(2)(iii), all notices of termination for grants that cover the right of publication of a work must clearly identify "the date of publication of the work under the grant." 37 C.F.R. § 201.10(b)(2)(iii). This date is different than the original date of publication. In Baldwin v. EMI Feist Catalog, Inc., the Second Circuit explained that the date of publication of a work is "a one-time event" and, when publication occurs before a grant is executed, the date of publication of the work under the grant is deemed to be the

date of the grant.  805 F.3d 18, 33–34 (2d Cir. 2015).  That is the case here.  (See Doc. No. 46 ¶ 134 (alleging that Que Sera, Sera was initially published pursuant to the initial copyright term granted in 1955)).  When Defendants brought up Baldwin in their opening brief, Tammy "concede[d] the precedent." (Doc. No. 51 at 8).  That is the end of the issue.[6]

Tammy's third and final argument is that the notices lack a complete and unambiguous statement of the facts required in 37 C.F.R. § 201.10(b)(2), and therefore violate 37 C.F.R. § 201.10(b)(3).  But this argument merely rehashes the two previous arguments the Court just addressed, as Tammy contends that the statements of fact are not clear and unambiguous because they do not state that the grants were already terminated and the notices do not accurately state the original date of publication.  (Doc. No. 51 at 9–10).  The Court need not repeat itself on those points.  In any event, the 37 C.F.R. § 201.10(b)(3) merely requires:

> Clear identification of the information specified by paragraphs (b)(1) and (b)(2) of this section requires a complete and unambiguous statement of facts in the notice itself, without incorporation by reference of information in other documents or records.

37 C.F.R. § 201.10(b)(3).  Tammy fails to articulate or even gesture at how the relevant notices fail to satisfy the provision without reference to her prior, duplicative arguments.  (See generally Doc. No. 46; see also Doc. No. 51 at 9–10).  This argument too must be discarded.

*    *    *    *

For the foregoing reasons, Tammy has failed to state a claim for declaratory relief that the notice of termination are "defective, ineffective, and invalid."

---

[6] Tammy does not allege the original date of publication of any composition other than Que Sera, Sera in her Second Amended Verified Complaint.  (See generally Doc. No. 46).  Because, as already explained, the Court must apply the allegations regarding Que Sera, Sera to the other compositions if it applies any allegations to those compositions at all, the result is the same.

## II. The Complaint's Alternate Requests for Declaratory Relief Are Not Justiciable.

As a backstop in the event that the Court "finds any or all of the [notices of termination] valid and effective," Tammy asks for a declaration that Defendants are obligated to pay her royalties from the continued exploitation of Jay's compositions because: (1) the grants' termination "does not terminate Plaintiff's right to share in, collect and receive songwriter's royalties as a beneficiary of the Livingston Music Trust, any other Trust, or receive such directly . . . [nor does it impact her] right to share in, collect and receive songwriter's royalties emanating from the exploitation of the song catalog of Jay Livingston or the other nonmonetary rights and benefits under the Renewal Agreements and Initial Term Agreements;" (2) termination pursuant to § 203 does not affect her right to receive songwriter's royalties; and (3) termination pursuant to § 203 does not affect any grant of rights made outside the United States. (Doc. No. 46 ¶ 165(l)).

However, the Court need not reach this issue on the merits. Defendants concede both that "the terminations do not affect the grant with respect to exploitations 'outside the United States,'" and that "Plaintiff retain[s] her right to receive royalties from the exploitation of the musical compositions [assigned back to JLM] as a beneficiary of her grandfather's trusts." (Doc. No. 50 at 16 n.7). Defendants later expand on this second point in their reply brief, stating, "Defendants do not, and have never disputed that (1) JLM has a duty to pay and (2) Plaintiff has a contractual right to receive royalties for the exploitation of those musical compositions by JLM." (Doc. No. 55 at 6). Based on these admissions, Defendants assert that there is no live controversy. (Id. (citing Robin Prods. Co. v. Tomecek, 462 F.2d 1193, 1198 (6th Cir. 1972))).

Tammy responds that a controversy remains over Defendants' obligations to pay her for the exploitation of whatever subset of compositions Travilyn did not reassign to JLM after she terminated their copyright grants. (See Doc. No. 51 at 16–17 ("Defendants' Motion to Dismiss

states the very controversy for which Plaintiff seeks this Declaratory Judgment, i.e., Defendants believe that JLM would no longer own the copyrights, so no royalties would flow into Jay's trusts pursuant to the Popular Songwriters Renewal Contracts")). But this subset does not exist. As Defendants explained in a recently filed declaration, "[a]fter each copyright termination, Travilyn executed a Copyright Assignment transferring the composition at issue back to JLM." (Doc. No. 78 ¶ 4). No allegation in the Second Amended Verified Complaint states otherwise. (See generally Doc. No. 46). Accordingly, there is no controversy for the Court to address. See Barry v. Lyon, 834 F.3d 706, 715 (6th Cir. 2016) ("If the plaintiff ceases to have standing such that a live case or controversy no longer exists, the case becomes moot").

**III.   The Court Will Not Impose a Constructive Trust.**

The Second Amended Verified Complaint requests as a remedy "a constructive trust be placed upon all of the assets of JLM prohibiting Defendants from transferring any or all of its assets to any person or entity to avoid payment of amounts properly due to [Tammy]." (Doc. No. 46 at 54–55). For the reasons already stated, Tammy is not entitled to relief. Accordingly, this remedy is not appropriate.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Second Amended Verified Complaint (Doc. No. 49) will be granted.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE